Christo P. Napuche v. Commissioner.
Napuche v. Commissioner
Docket No. 62078.
United States Tax Court
T.C. Memo 1961-239; 1961 Tax Ct. Memo LEXIS 110; 20 T.C.M. (CCH) 1225; T.C.M. (RIA) 61239; August 24, 1961
J. Bruce Donaldson, Esq., and William D. Cohan, Esq., for the petitioner. John J. Yurow, Esq., for the respondent. HARRON Supplemental Memorandum Findings of Fact and Opinion HARRON, Judge: After the filing of the Court's Memorandum Findings of Fact and Opinion in this case (T.C. Memo 1959-112), but before the entry of decision under Rule 50, the petitioner filed a motion for a further hearing, which was granted. At the further hearing additional evidence was presented. The pleadings have been *111 amended. The Commissioner determined deficiencies in income tax for the taxable years 1946-1951, inclusive, additions to the deficiencies under section 293(b) (1939) Code), and an addition to the tax for 1948 under section 291(a), as follows: Sec.
Sec.
Year
Deficiencies
293(b)
291(a)
1946
$7,594.97
$3,259.40
None
1947
8,089.70
4,044.85
None
1948
4,482.79
2,241.40
$976.45
1949
1,101.08
550.54
None
1950
3,703.52
1,851.76
None
1951
82.00
41.00
None
The issues raised by the pleadings, as amended, are as follows: (1) Whether the determination of a deficiency for any of the years 1946 through 1951 is barred by a statute of limitations. Under this issue the questions are whether income tax returns were filed for 1948 and 1951; whether a false and fraudulent return was filed for any of the years 1946-1951, inclusive, so that the provisions of section 276(a) (1939 Code) apply; and whether the 5 year period of limitations provided by section 275(c) applies to the year 1949. (2) What the basis is of a building purchased by the petitioner in 1948, for purposes of the annual depreciation reserve. Under this issue an allocation must *112 be made of the total purchase price of the property between the land and the building. (3) Whether the petitioner in his returns understated his taxable income for any of the years 1946-1951, inclusive. The repondent resorted to the increase in net worth plus expenditures method in determining the deficiencies. The petitioner contests the reliability and validity of the net worth analysis. Under this issue the questions are: (a) Whether the respondent erred in not including in the opening statement of assets an amount for undeposited cash hidden and separated by the petitioner from other cash, and another amount for a cash fund used to cash checks for customers as an accommodation; and whether respondent erred in not including in assets at the end of other years, any amount for undeposited cash hidden and separated by petitioner from other cash, and in not allowing an adequate and reasonable amount at the end of 1946 for another cash fund used to cash checks for customers. (b) Whether the respondent erred in his estimate in his net worth statement of the amount spent each year by petitioner for his nondeductible living expenses. If it is held that determinations of deficiencies *113 for all or some of the years are not barred and that there are deficiencies, whether any deficiency for the years 1946-1950 in whole or part is due to fraud with intent to evade tax for the purpose of additions to the deficiencies under section 293(b). Respondent now concedes that for 1951 no addition to the deficiency under section 293(b) is due. Whether the respondent erred in determining that an addition to the tax for 1948 is due under section 291(a). Supplemental Findings of Fact [1]
The petitioner is a resident of Detroit, Michigan. He filed Federal income tax returns for the taxable years 1946, 1947, 1949, and 1950 with the collector of internal revenue for the district of Michigan at Detroit. The petitioner is a single individual who has never married. He does not have any dependents. He has at all times lived in the most economical way. Prior to the taxable years, during *114 the time he was employed in restaurants, petitioner received most of his meals at no cost where he worked, and he shared an apartment with others, thereby obtaining a room at a low cost. During the taxable years 1946-1951, inclusive, petitioner lived in a rented room for which he paid $12 a week. He purchased one meal a day in restaurants. He did not own an automobile during the taxable years. Petitioner's living expenses did not exceed $1,100 each year during 1946-1951. The native language of the petitioner is Albanian. His entire education was limited to 4 years in schools in Albania, where he was born. After petitioner came to the United States in 1916, he did not attend any school and did not receive any formal instruction in the English language. He has acquired a very limited knowledge of English; he is unable to understand all of the material, printed and written in English, which he reads; his vocabulary is limited; he uses and understands only simple and elementary English expressions; his comprehension of spoken and written English is limited and defective. He has difficulty in expressing his thoughts. Petitioner's understanding of business and accounting terminology *115 is limited and defective. He is unable to understand most of the words printed on Federal income tax forms. He is unacquainted with accounting and general bookkeeping procedures. He is able to keep only the simplest type of cash records. His penmanship is poor and his notations in his cash books are illegible in many instances. Petitioner is unable to make up and keep even the simplest kind of accounting records. He has been obliged at all times to employ an accountant to set up and make the entries in account books to show his business receipts and expenditures, and he must rely upon his accountant. He also relies on bank clerks to check his deposit slips and additions of figures. He uses an adding machine, however. The petitioner has very little understanding of the requirements of the Federal income tax laws and procedures; he is unable to prepare his income tax returns; he is obliged to have his accountant prepare his returns; he has relied upon his accountant at all times to prepare and file his returns. During the years 1947-1951, inclusive, there was only one accountant employed by petitioner. (Prior to 1947, he had a different accountant.) He handled all of petitioner's *116 accounting work, prepared monthly summaries of his cash receipts and disbursements, took care of his bank check records, and made annual trial balance sheets in conjunction with the foregoing. The accountant's monthly summary of cash receipts and disbursements included petitioner's daily cash receipts and disbursements and a check register. The petitioner made entries daily in a cash book of amounts which purportedly represented all of his cash receipts. His accountant in 1947-1952 accepted the figures entered for receipts because no cash register tapes were retained, if any. He substantiated purchases of merchandise and disbursements by checking invoices and payments made by checks. Petitioner's accounting records consisted only of his cash books; he did not maintain ledgers. The accountant made up and retained accounting work papers. The accountant made up petitioner's returns from the work papers which he prepared from petitioner's cash books and invoices. It was the accountant's customary procedure to prepare a return for each year, take it to the petitioner's place of business and have petitioner sign the return in his presence, and then mail the return for petitioner. *117 The same accountant prepared petitioner's returns for the years 1947-1951, inclusive. The accountant retained copies of the returns. That accountant prepared returns of the petitioner for 1948 and 1951 and had petitioner sign each return. Each return for 1948 and 1951 showed an overpayment of tax, and on each return an election was made to credit the amount of the overpayment to the tax for the succeeding year. In the return for 1948, the overpayment of tax was stated to be $577; in the 1951 return, the overpayment of tax was stated to be $220. Petitioner executed an income tax return for 1948 and for 1951; his accountant mailed to and timely filed each return with the district director [2] in Detroit. In both of the returns filed for 1948 and 1951, the petitioner made claims for overpayments of tax. On March 1, 1948, the petitioner purchased the lot and two-story building located at 12818 East Jefferson Street, Detroit, for $40,000, which amount was paid by giving a mortgage for $25,000 and paying $15,000 in cash. *118 The business of the petitioner, a bar called the Bronx Cafe, where no food was served, was located in rented premises at 12812 East Jefferson Street. The two-story building purchased by petitioner had on the ground floor two areas; one was rented to a restaurant and the other was rented to a barber shop. The second floor was divided into three apartments. The petitioner moved the Bronx Cafe to 12818 East Jefferson in 1948, into the area which had been rented as a barber shop and the barber moved upstairs. The petitioner continued to rent the other half of the ground floor to the restaurant-tenant. In 1949, the petitioner took over the entire building, remodeled the ground floor, made various improvements, and then used the entire first floor for the Bronx Cafe. After the tenants vacated the premises, in 1949, the petitioner did not rent any part of the building. In 1948 and 1949, the petitioner received rents from the tenants totaling $1,975 and $600, respectively. He reported these amounts of rents in his returns for 1948 [3] and 1949. *119 The proper apportionment of the lump sum purchase price of $40,000 for 12818 East Jefferson Street between the depreciable and undepreciable properties is $30,500 [4] for the building and $9,500 for the land. For the purposes of the respondent's net worth statement, the amount of allowable depreciation each year of the building for "depreciation reserve", should be increased in each of the years 1948-1951, inclusive, by $1,222. [4]
The petitioner spent for improvements and additions to the building $8,906.26 in 1948; $6,441.45 in 1949; and $14,875.81 in 1950. Thus, the total amounts spent for building improvements at the end of each of the years 1948-1951, were: $8,906.26 end of 1948; $15,347.71 end of 1949; and $30,223.52 end of 1950 and 1951. The improvements included installation of an air-conditioning unit and various interior alterations. In 1948, petitioner spent $2,221.40 for building fixtures. He spent $495.70 in 1949 for television. At the end of 1950 and 1951, there were outstanding debts of the petitioner in the total amount of $7,000 due contractors for *120 building improvements. The respondent now concedes that $7,000 should be included in the liabilities of the petitioner at the end of 1950 and 1951 in his net worth analysis. In 1947 the petitioner paid a fine of $1,532.90 for a violation under O.P.A. In his net worth statement upon which the respondent determined the deficiencies, he treated this payment as a nondeductible expenditure in 1947 thereby increasing taxable income for 1947 by the amount of the payment. Respondent now concedes that the circumstances and facts were such that the O.P.A. fine was a deductible expenditure; therefore, petitioner's income for 1947, computed under the net worth method, should not be increased by $1,532.90. [5]
In his return for 1948 no dividends were reported although the dividends paid on stock owned by petitioner amounted to $1,000. In 1948 petitioner's stocks were pledged with Bache and Company to secure a loan. In his return for 1951, the entire amount of dividends on petitioner's stocks, $1,450 was reported. [6]
*121 The petitioner, as part of his bar business and an accommodation, cashed checks for customers, including pay checks. In order to do so, he kept a fund of cash at his place of business. When he had cashed checks aggregating as much as from $10,000 to $15,000, he took the checks to the bank where he had a commercial account, deposited them in his account, and withdrew the same amount of cash as the amount of the deposited checks, so as to replenish the fund for cashing checks. Some times he cashed a check received from a customer and put the cash in his check cashing fund. At the end of 1945 there was considerable business activity in the area; Kaiser-Frazer, Hudson, Continental Motors, and Budd Wheel were working several shifts. At the end of 1945, the check cashing fund which petitioner maintained at his bar was at least $15,000. An asset of cash of $15,000 was not taken into account in the respondent's net worth analysis. At the end of 1946, petitioner had in his cash fund for cashing checks at least $12,500, [7] rather than $5,206.47. *122 Although petitioner made a small charge, pennies, for cashing checks for customers, he did not realize income from this source. The bank made a charge for the checks petitioner deposited in his checking account, a standard charge for handling items of deposit, and some times a customer's check which petitioner had cashed was returned as a bad check. Thus, petitioner realized no income and some times he sustained a loss from the cashing of checks. In his returns for 1946-1951, inclusive, the total gross receipts reported for each year were somewhat more than twice the amount of the reported cost of goods sold in each year, except in 1951, as is shown below: 1946
1947
1948
1949
1950
1951
Total
$62,044.53
$65,496.06
$53,558.46
$50,411.98
$58,799.28
$50,362.57
receipts
Cost of
25,365.38
32,126.37
24,832.15
22,805.95
29,292.24
25,413.74
goods sold
In his net worth analysis, the respondent accepted as correct the petitioner's amounts for his inventory of merchandise on hand at the end of each of the years 1946 through 1951. For the end of 1945, he made an adjustment increasing the petitioner's figure for such inventory from $1,475.25 *123 to $4,711.20. This adjustment was made upon the audit of petitioner's return for 1945, at which time petitioner accepted the adjustment. In his returns for the years involved, petitioner reported earnings and losses from his bar business as shown below; he reported net earnings of $11,902.66 for 1946; $3,812.05 for 1947; $1,962.75 for 1949; and $691.18 for 1950. He reported a loss of $1,798.14 for 1948; and a loss of $4,104.53 for 1951: 1946
1947
1948
Gross receipts
$62,044.53
$65,496.06
$53,558.46
Costs and expenses
50,141.87
61,684.01
55,356.60
Profit
$11,902.66
$ 3,812.05
($ 1,798.14)
1949
1950
1951
Gross receipts
$50,411.98
$58,799.28
$50,362.57
Costs and expenses
48,449.23
58,108.10
54,467.10
Profit
$ 1,962.75
$ 691.18
($ 4,104.53)
In his return for 1946, the petitioner reported taxable income totaling $12,025.36 consisting of a net profit from the bar business of $11,902.66 and $122.70 from coin machines. The respondent's net worth analysis shows $5,578.71 as the amount of income taxes paid by petitioner in 1946, but no explanation is given for this total amount which is accepted as correct. In petitioner's *124 1946 return, the following is shown: Payments 1946 Estimated Tax
$3,049.50
Tax due per return
2,878.16
Overpayment (to be credited on
1947 tax)
$ 171.34
Petitioner's 1946 return was prepared by an accountant, William Moons. He was not petitioner's accountant after 1947. The only income reported in the 1947 return was net profit from the bar business of $3,812.05, after reported gross receipts of $65,496.06, from sales of liquor, beer, and other beverages costing $32,126.37. The return showed the following about tax payments: 1947 Payments of Estimated Tax
$2,346.50
Tax due
577.00
Overpayment to be refunded
$1,769.50 Respondent's net worth statement shows income tax paid (without explanation) in 1947 of $2,309.72, and there is no dispute about that amount. The income reported in petitioner's 1948 return consists of $1,975, rent receipts and a loss from the bar business of $1,798.14, after gross receipts of $53,558.46, and net cost of merchandise sold amounting to $24,832.15. The net taxable income reported amounted to $176.86, and there was no tax reported due. Payments of estimated tax were reported amounting to $577, and credit to the *125 1949 estimated tax was requested. Respondent has credited this amount to the deficiency determined for 1948 in the account of payments. Respondent's net worth analysis shows that petitioner received an income tax refund in 1948 of $1,219.50, which is not denied, for a prior year. The income reported in petitioner's 1949 return is $2,562.75 consisting of rents, $600, and net profit from the bar business of $1,962.75, after reported sales of $50,411.98 for goods having a net cost of $22,805.95. The return reported: 1949 Estimated Tax paid
$577.00
Tax due, 1949
283.00
Overpayment
$294.00 Request was made to credit the overpayment to the 1950 tax. In respondent's net worth statement, the income tax paid in 1949 was shown to be $964.26, which is not disputed. In his return for 1950, dividends were reported, for the first time, in the amount of $1,200; a net gain of $691.18 from the bar business (after sales of $58,799.28 of goods costing $29,292.24) increased income to a net amount of $1,891.18. Petitioner reported payments of $294 for 1950 Declaration of Estimated Tax; tax due of $191; and overpayment of $103, to be credited to the 1951 tax. In respondent's net *126 worth statement, income tax paid in 1950 is shown to be $144.25, which is not disputed. In the return for 1951, petitioner reported a loss from the bar business of $4,104.53 (after sales of $50,362.57 of goods costing $25,413.44); $1,450 of dividends; [8] and a net loss of $2,654.53. Payments on the 1951 Declaration of Estimated Tax were reported in the amount of $220, to be credited to the 1952 tax. In respondent's net worth statement $117 is the amount shown for tax paid in 1951, which is not disputed. Petitioner received dividends on shares of stock in the years 1946-1950, which were not reported in his returns, as follows: $675 in 1946; $800 in 1947; $1,000 in 1948; and $700 in 1949. Petitioner had in his possession undeposited cash in the amount of $6,515.59 at the end of 1945; $4,500 at the end of 1946; and $4,000 at the end of 1947, which amounts of cash were in addition to other amounts of cash on hand for the purpose of cashing checks of customers. The total amounts of undeposited cash held by petitioner at his place of business at the end of the years involved were as follows: $21,515.59, *127 1945; $17,000, 1946; $19,509.84, 1947; $12,739.76, 1948; $9,327.72, 1949; $9,400, 1950; and $7,145.05, 1951. The petitioner's net worth at the end of the years 1945-1951 was as follows: 1945
$ 73,560.03
1946
79,581.68
1947
90,704.58
1948
102,625.08
1949
108,367.05
1950
115,401.61
1951
114,887.65
The petitioner's total income and the amounts of his unreported income for the taxable years were as follows: [9]
1946
1947
1948
Increase in Net Worth
$ 6,021.65
$11,122.90
$11,920.50
Living Expenses
1,100.00
1,100.00
1,100.00
Income Tax Paid
5,578.71
2,309.72
(1,219.50)
Total Income
$12,700.36
$14,532.62
$11,801.00
Reported Income
12,025.36
3,812.05
0
Unreported Income
$ 675.00
$10,720.57
$11,801.00
1949
1950
1951
Increase in Net Worth
$ 5,741.97
$ 7,034.56
($ 513.96)
Living Expenses
1,100.00
1,100.00
1,100.00
Income Tax Paid
964.26
144.25
117.00
Total Income
$ 7,806.23
$ 8,278.81
$ 703.04
Reported Income
2,562.75
1,891.18
0
Unreported Income
$ 5,243.48
$ 6,387.63
$ 703.04
*128 In summary, the petitioner received and failed to report taxable income for the taxable years, as follows: 1946
$ 675.00
1947
10,720.57
1948
11,801.00
1949
5,243.48
1950
6,387.63
1951
703.04
The petitioner's assets, liabilities, and net worth at the end of the years 1945-1947, were as follows: Assets
1945
1946
1947
Cash
$ 6,515.59
$ 4,500.00
$ 4,000.00
Check Cashing Fund
15,000.00
12,500.00
15,509.84
Cash Deposited in 1947
7,276.00
Bank Svgs., 107212
27,739.50
Bank Svgs., 29887
10,213.07
4,322.74
Bank Svgs., 346769
5,134.61
Detroit Bk. Comm'l
1,172.12
Ind. Nat'l Bk., Comm'l
4,414.59
974.66
Bar Fixtures
6,907.98
6,907.98
6,907.98
Bus. Investment
9,787.72
9,787.72
9,787.72
Mchdse. Inventory
4,711.20
4,637.44
8,212.60
Bache; Stocks
24,774.37
38,558.77
$75,076.58
$81,571.24
$93,606.38
Less Dep. Res.
778.42
1,464.53
2,150.64
$74,298.16
$80,106.71
$91,455.74
Liabilities
Taxes Due
738.13
525.03
751.16
NET WORTH
$73,560.03
$79,581.68
$90,704.58
Petitioner's assets, liabilities, and net worth at the end of the years 1948-1951, were as follows: Assets
1948
1949
1950
1951
Check Cashing Fund
$ 12,739.76
$ 9,327.72
$ 9,400.00
$ 7,145.05
Bank Svgs., 346769
3,995.69
4,024.41
1,038.30
470.80
Bank Svgs., 29887
5,641.63
5,252.13
52.13
52.13
Bank Svgs., 41835
6,000.00
1,630.99
Detroit Bk. Comm'l
100.82
.79
24.83
251.87
Cash, Court Custody
7,500.00
Cash, Escrow
2,978.75
5,392.79
5,392.79
Land, E. Jefferson
9,500.00
9,500.00
9,500.00
9,500.00
Bldg., E. Jefferson
30,500.00
30,500.00
30,500.00
30,500.00
Bldg. Improves.
8,906.26
15,347.51
30,223.52
30,223.52
Bldg. Fixs.
2,221.40
2,221.40
2,221.40
2,221.40
Bar Fixs.
6,907.98
6,907.98
6,907.98
6,907.98
Bus. Invest.
9,787.72
9,787.72
9,787.72
9,787.72
TV
495.70
495.70
495.70
Mchdse. Invy.
8,411.20
7,966.80
7,110.00
6,070.00
Bache; Stocks
38,558.77
38,558.77
38,558.77
38,558.77
$137,271.23
$142,869.88
$157,213.14
$156,708.72
Less Dep. Res.
5,170.39
7,309.25
10,462.65
13,615.99
$132,100.84
$135,560.63
$146,750.49
$143,092.73
Liabilities
29,475.76
27,193.58
31,348.88
28,205.08
NET WORTH
$102,625.08
$108,367.05
$115,401.61
$114,887.65
*129 The increases in petitioner's net worth in the years 1946 through 1951 are computed as follows: Net Worth 1946
$ 79,581.68
Net Worth 1945
73,560.03
1946 Increase
$ 6,021.65
Net Worth 1947
$ 90,704.58
Net Worth 1946
79,581.68
1947 Increase
$ 11,122.90
Net Worth 1948
$102,625.08
Net Worth 1947
90,704.58
1948 Increase
$ 11,920.50
Net Worth 1949
$108,367.05
Net Worth 1948
102,625.08
1949 Increase
$ 5,741.97
Net Worth 1950
$115,401.61
Net Worth 1949
108,367.05
1950 Increase
$ 7,034.56
Net Worth 1951
$114,887.65
Net Worth 1950
115,401.61
1951 Decrease
$ ( 513.96)
Petitioner filed timely income tax returns for each of the years 1946-1951, inclusive. An addition to the tax for 1948, under section 291(a), in the amount of $976.45 is not due from the petitioner. Petitioner made payments in the amount of $220 on the estimated tax for 1951. In his return for 1951, he made claim for overpayment of the 1951 tax in the same amount, to be credited on the 1952 estimated tax. The petitioner did not file false and fradulent returns for 1946 and 1951; therefore, assessment of deficiencies for 1946 and 1951 are barred. The petitioner filed false *130 and fraudulent returns for 1947, 1948, 1949, and 1950. Part of the deficiency for each of those years is due to fraud with intent to evade tax. The stipulated facts are found as stipulated and are incorporated herein by reference. Supplemental Opinion In this case, exceptional circumstances existed which clearly established that under Rules 19(b) and (e) of the Court's Rules of Practice petitioner's motions for further trial and reconsideration should be granted. When this case was tried originally, petitioner elected to appear for himself. See Rule 3. Upon further trial, the petitioner was represented by counsel; [10] the pleadings were amended; new evidence and testimony were presented; and by stipulation of the parties certain disputed items have been settled. *131 The Supplemental Findings of Fact dispose of all of the questions presented by the pleadings, as amended. No good purpose will be served by any extended discussion of the evidence. The petitioner contends, inter alia, that he did not attempt to conceal any facts or any assets from the respondent's agents during their investigation of his returns; that he was not uncooperative with the agents during their investigation, either in general or in submitting information about his assets, and that he did not at any time abandon his claim that at the beginning of the net worth period, December 31, 1945, he had an accumulation of undeposited cash savings in a substantial amount which accounted for the increases in his net worth during the years involved. The entire record now before us supports these contentions. It now has been established that the petitioner was unable to comprehend and did not understand what is involved in the net worth plus nondeductible expenditures method of determining taxable income, and what was involved in the respondent's use of that method in this instance. It has been shown, further, that the accountant, Zalenko, who was petitioner's accountant during part *132 of 1947 and throughout the years 1948-1952, inclusive, endeavored to cooperate fully with the investigating agents. It has been shown, also, that there has been a considerable amount of lack of understanding on the part of the petitioner throughout. All of these circumstances have been taken into consideration. [11]
The entire record before us has been fully reviewed and considered. The modifications and revisions of the material facts and conclusions set forth in the original report, which are required upon consideration of the additional evidence and testimony, have been clearly indicated. Upon the further trial, several matters have been explained and clarified and the petitioner has succeeded in some respects in successfully meeting his burden of proof, with respect to which he at first failed. We first consider the question whether petitioner filed returns for 1948 and 1951. In the statutory notice of deficiencies, the respondent determined that no returns had been filed for 1948 and 1951; and for the year 1948, he made an addition to the tax under section 291(a). *133 The petitioner and his accountant, Zalenko, testified at the further hearing that both returns were executed by the petitioner and timely mailed to the district director by the accountant. The retained copies were presented. They show that the petitioner, in the returns, reported overpayments of estimated taxes and made elections to have them credited to the tax for the succeeding year, in each instance. The respondent did not introduce any probative evidence to show what the district director's records reflect; there is no testimony that the respondent made a careful search of the district director's records to ascertain whether returns were filed; and no proof was offered to demonstrate that the district director's records indicate that the returns were not received and filed. This is not a case where there is a conflict between the taxpayer's testimony, on the one hand, and what the respondent's records show, on the other hand. Rather, the testimony that the returns were executed and mailed, timely and properly, stands unimpeached. In Walter M. Ferguson, Jr., 14 T.C. 846, 850, we observed that the loss of a return by the then collector was a possibility; the same *134 observation may be made here. In the absence of evidence that the district director's records show that returns were not filed and in view of the fact that the petitioner consistently filed returns, we are unable to reject or disbelieve the testimony of petitioner's accountant that the petitioner executed the returns in his presence and that the accountant, himself, properly mailed the returns for 1948 and 1951 to the district director in Detroit. The finding has been made, therefore, that both returns were filed timely and that no addition to the tax for 1948 under section 291(a) is due from the petitioner. We consider, next, the issue involving the value of the building purchased by petitioner in 1948 for the lump sum of $40,000. For purposes of the depreciation reserve used in respondent's net worth analysis, it is necessary to determine what amount of the purchase price is properly allocable to the building. On the income tax returns filed by the petitioner for the years 1948 through 1951, the accountant allocated this total amount between land and building as follows: land, $5,000; building, $35,000. Using a twenty-five year estimated life, the depreciation claimed in each of *135 the years 1948 through 1951 was $1,400 per annum. The revenue agent, in computing the depreciation reserve for net worth purposes, modified the accountant's allocation and treated $20,000 as the basis of the land and $20,000 as the building basis. The effect of this adjustment was to disallow depreciation of $600 for each of the years 1948 through 1951. On cross-examination the revenue agent admitted he is not an expert in real estate values, he did not consult the engineering section of the district director's office to obtain an opinion, and that the adjustment was made on the basis of an allocation between land and building on the City Assessor's records of the City of Detroit. The petitioner produced qualified expert testimony at the further hearing that the amounts shown on the City Assessor's records for the building does not represent fair market value but is simply a base for taxation, that no correlation exists between the method of valuing land for assessment purposes and that used in valuing buildings, and that the Assessor's last appraisal of the property was made in 1938. The expert further testified that as of January 1948 the value of the land was between $9,000 and *136 $10,000, and the value of the building, between $30,000 and $31,000. All of the testimony of the witnesses of both parties relating to this question of fact has been carefully considered. The respondent's determination, in our opinion, represented an arbitrary and unsound allocation of 50 percent of the purchase price to the land and building, each. Petitioner's expert witness had knowledge of values of comparable properties close to the property in question in 1948, and we regard his opinion of the respective fair market values of the land and building as competent. It has been found that the respective values of the land and building at the time of purchase were $9,500 and $30,500; the basis of the building for depreciation is $30,500; therefore, the annual allowance for depreciation in the reserve for depreciation in the respondent's net worth statement should be and is increased to reflect $1,222 of additional depreciation for each year, 1948 through 1951. It is necessary to determine the amount of petitioner's living expenses for each taxable year. In his net worth analysis, the respondent determined that they were $1,500 per year. It is now admitted by respondent's agent *137 that this amount represented only an estimate and that it was not arrived at on the basis of actual facts ascertained by him. The petitioner claims that his actual expenditures for his living expenses amounted to no more than $800 per year during the taxable years. However, several details in his testimony, when analyzed, indicate that his expenditures exceeded $800 per year and were $1,100, which we find and conclude was the amount each year of his living expenses. In so finding, petitioner's very frugal and modest standard of living has been taken into account. The respondent now agrees that at the end of 1950 and 1951, petitioner owed $7,000 to contractors, which amount should be included in his net worth statement in liabilities of the petitioner. He also now concedes that the O.P.A. fine of $1,532.90 paid in 1947 was, for tax purposes, a deductible expense and, therefore, should not be included in his net worth statement as a nondeductible expenditure. See Jerry Rossman Corporation v. Commissioner, 175 F. 2d 711; Pacific Mills, 17 T.C. 705, affirmed 207 F.2d 177; American Brewery v. United States, 223 F. 2d 43. It is necessary *138 to determine the amounts of undeposited cash, if any, of the petitioner at the beginning of the net worth period and at the end of each of the taxable years. The petitioner at all times has claimed that he had a substantial amount of accumulated cash, not deposited in any bank, at the end of 1945 and subsequent years. He claims that he had $45,000 of such cash at the end of 1945, of which $15,000 was held as a fund for cashing checks, and $30,000 was a separate amount of savings. The petitioner had the burden of introducing competent proof in support of these contentions. It is concluded and we find that petitioner had a fund of cash held for check cashing purposes at the end of 1945 and 1946 in the amounts of $15,000 and $12,500. There is no dispute about the amounts of cash held for this purpose at the end of the years 1947-1951, inclusive. With respect to other cash on hand, we find and conclude that the respective amounts were, at the end of 1945, 1946, and 1947, $6,515.59, $4,500, and $4,000. The petitioner has not established, in our view, that he had additional cash accumulations at the end of the years 1945-1948, inclusive, of $30,000, $30,000, $20,000, and $5,000. *139 The petitioner's records of his gross receipts from his bar business during the taxable years involved were not reliable. He carried on a cash business using at least one, if not more, cash registers. It was necessary, without any doubt, for him to continuously take and retain the readings of each cash register in order to have an accurate record and proof of the amounts of his gross receipts each day, week, month, and year. Such readings may or may not have been shown on cash regriter tapes or slips, depending upon the age and type of each cash register. The record before us is not clear on this point. Nevertheless, cash registers, even the old styles, are constructed to show on the machine itself the total figures for cash sales run through a cash register and, assuming that all receipts are run through cash registers, the cash register sums, or readings, are evidence of gross receipts. The accountant who was employed by petitioner prior to 1948, and until around April 1947, Moons, testified that he took readings of the cash register, or cash registers, used by petitioner during 1946 and before. Moons prepared the 1945 and 1946 returns in which net profits from the bar business *140 were reported to be $14,263.36 and $11,902.66, respectively, apart from small amounts of other income. The petitioner dismissed Moons in the spring of 1947, after he had made up petitioner's 1946 return. There is no proof that after the services of Moons ended, the petitioner continued to take cash register readings and keep a record of them. The next accountant, Zalenko, testified that he did not take readings of any cash register or advise petitioner that it was necessary for him to do so. The petitioner has failed to prove that the amounts of total cash receipts which he entered in the cash books maintained by him were the same as the amounts of total cash receipts shown on his cash registers. The petitioner's bookkeeping entries were not clearly made, they are not legible in many instances, and he has not been able to substantiate as accurate and correct his entries of total, gross, cash receipts during the years 1947-1950, inclusive. Zalenko accepted without question all of the entries of petitioner in his cash books and prepared his returns from them. An argument is made that assuming the figures in the returns for the above 4 years for purchases of merchandise are correct, *141 the gross receipts reported in the returns should be accepted as correct because the amounts of gross receipts reported reflect a mark-up of from 100 to about 125 percent, roughly, and petitioner's bar was in a district where the trade did not purchase drinks at anything above low or moderate prices. This is no more than argument, it is self-serving, and it falls short of the required proof that petitioner's accounting records for the years 1947-1950, inclusive, were accurate and complete, and entitled to receive full weight. Upon further consideration of the entire record now before us, we adhere to the conclusion that petitioner did not maintain adequate, complete, and reliable accounting records, and that under all of the circumstances the respondent was justified in resorting to the net worth method of determining petitioner's taxable income for all of the years involved. Consideration has been given to all of the general circumstances including petitioner's lack of training in bookkeeping and his other deficiencies. But petitioner had and used an adding machine, and we cannot overlook the fact that he had many years of business experience and carried on a business having substantial *142 gross receipts. He knew that an accountant's services were helpful and employed accountants. These factors, in all fairness to the petitioner, indicate that it was not impossible for him either to keep and maintain or have maintained accurate records of his gross receipts and, as well, accurate records of inventories. He must be held to the reasonable requirements to which all taxpayers operating business enterprises are held. The petitioner's present difficulties are of his own making. This Court has taken the view in many instances that a taxpayer's alleged ignorance and reliance upon others in the matters of keeping complete and accurate accounting records "are inadequate excuses." Walter M. Ferguson, Jr., supra, p. 849. One factor which militates against petitioner's contentions that his returns are correct and that he did not receive more taxable income than was reported for each year is the amount of gross receipts reported for each year. For example, for the 4 years 1947-1950, inclusive, the returns show reported gross receipts of $228,265.78, but net earnings of only $4,667.84, after taking into account a reported loss of $1,798.14 for 1948. Petitioner did not *143 offer any explanation for the low ratio of reported net profits to reported gross receipts. There are set forth in the Findings of Fact the amounts of gross receipts, costs and expenses, and profits and losses reported by the petitioner for the 6 years 1946 through 1951. On their face, these figures, because of the lack of consistency and the decline in profits, require explanation. Petitioner has not provided any. Comparisons of the returns prepared by Moons for 1945 and 1946 with those filed for 1947 through 1950 illustrate the problem. The following schedule is made from the returns filed for the years 1945 and 1946. It shows a markedly different ratio of the net profits to the gross receipts of the bar business: Gross
Costs and
Net
Years
Receipts
Expenses
Profits
1945
$ 75,426.58
$ 61,163.22
$14,263.36
1946
62,044.53
50,141.87
11,902.66
Totals
$137,471.11
$111,305.09
$26,166.02
In 1947, the reported gross receipts were larger than the gross receipts reported for 1946 by about $3,451, but the reported profits dropped to $3,812. The petitioner did not offer any explanation. The following schedule indicates the erratic relationship of *144 reported gross income, net income, and loss: Gross
Costs and
Net
Years
Receipts
Expenses
Profits
1947
$ 65,496.06
$ 61,684.01
$3,812.05
1948
53,558.46
55,356.60
(1,798.14)
1949
50,411.98
48,449.23
1,962.75
1950
58,799.28
58,108.10
691.18
Totals
$228,265.78
$223,597.94
$4,667.84
It is not impossible that after 1947, there was a decline in the volume of petitioner's business and profits. However, the petitioner offered no explanation of what appear to be the disproportionate decreases in reported earnings. In contrast, during the years 1946 through 1950, there was a steady increase in petitioner's net worth. Again, it must be noted that the record before us shows inconsistencies which are substantial, for which neither the petitioner nor his accountant, Zalenko, have provided convincing explanations. Actually, petitioner did not attempt to provide any explanations other than one, namely, that at the end of 1945, he had undeposited cash savings of $45,000, a sufficiently large amount to provide the sources of sums expended for new assets and improvements after 1945, so that in spite of the reported decreases in the earnings of petitioner's *145 business he was able to make large investments. Here, as in most cases where the respondent resorts to the net worth method of determining income, the taxpayer's basic contention is that he had a hoard of cash at the beginning of the net worth period which, if included as an asset in the net worth analysis, greatly reduces or eliminates the Commissioner's analysis of increases in net worth and the resultant amounts of unreported income. Petitioner did not attempt to explain his contention that he had $45,000 undeposited cash on hand at the end of 1945, or to state the sources of that amount. He did no more than assert that he had that sum in addition to the total of his bank account balances which were $32,154.09 at the end of 1945. His position is that by the end of 1945, he had saved at least $77,154.09 in cash, in addition to his investment in his bar business and expenditures for bar fixtures and merchandise, all of which aggregated $21,406.90. There is no evidence which supports petitioner's claim that his savings up to 1946 were so substantial. Absent corroborative proof, his claim is only self-serving and cannot be accepted as wholly credible. Neither petitioner's own explanations *146 to respondent's agents about his employment before going to Detroit in October 1942, nor what is shown by the Commissioner's records of returns filed and taxes paid by the petitioner prior to 1942 indicate that he could have had earnings in such large amounts during the years before 1942 as to be able to save such a substantial sum. The respondent's agents obtained from the Social Security Administration of the Department of Health, Education, and Welfare, an abstract of the record of petitioner's earnings which had been credited to his social security account since the last quarter of 1937. It indicates that his earnings were less than $2,000 a year prior to 1943 in the various jobs he held. The petitioner has not claimed or established that he had any sources of income during that period of his employment other than his earnings as an employee. It was not until October 1943 that petitioner engaged in a bar business. He then entered into a partnership with Thomas and Elias Levaris, acquiring a one-third interest for $3,300. In October 1944, he purchased the interests of his partners for $11,000, and thereafter operated the business as a sole proprietor. The respondent's net worth *147 analysis starts with petitioner's net worth at the end of 1945, which was a little over 2 years after the petitioner's acquisition of an interest in the business. Upon the entire record, it cannot be found that petitioner had undeposited cash of $45,000 at the end of 1945. Under all of the circumstances, our conclusion that the petitioner had as much as $21,515.59 undeposited cash savings at the end of 1945 is liberal. There remain the questions whether for any of the years 1946 through 1950, false and fraudulent returns were filed and whether any deficiencies are due to fraud with intent to evade tax. The respondent had the burden of proof under this general issue. At the further hearing, the respondent abandoned his determination with respect to the addition to the deficiency for 1951 for fraud under section 293(b). Although the record is not clear on this point, it appears that with respect to the year 1951, an agreement was executed extending the period for assessment to June 30, 1956; therefore, it appears that the statute of limitations issue under section 276(a) does not include 1951. With respect to the year 1946, there is not the required clear and convincing proof that *148 a false and fraudulent return was filed. The accountant who prepared the return, Moons, testified that he had taken the readings from petitioner's cash registers each month and prepared the 1946 return accordingly. Gross and net income were reported in the respective amounts of $62,044.53 and $11,902.66. It was not until after 1946 that there were marked and unexplained decreases in the amounts reported as net profits. After the adjustments made herein in the opening net worth, the amount of unreported income for 1946 is $675. Although dividends of $675 were not reported, that fact alone does not establish that the return for 1946 was false and fraudulent. Petitioner was highly negligent in failing to acquaint his accountant with the facts about his purchases of stocks and receipts of dividends in 1946. However, negligent omissions from income are not the equivalent of intent to defraud. Walter M. Ferguson, Jr., supra. Our conclusions about the returns filed for the years 1947 through 1950 are that false and fraudulent returns were filed with intent to evade tax under section 276(a), and, further, that parts of the deficiencies are due to fraud with intent to evade *149 tax under section 293(b). After the adjustments made herein, the net worth analysis establishes that petitioner failed to report income of $10,720.57 for 1947, $11,801 for 1948, $5,243.48 for 1949, and $6,387.63 for 1950, or a total of $34,152.68, of which $2,500 was unreported dividends. Petitioner's failure to report dividends in 1946, the year of the purchases of stocks, may have been a negligent oversight, but his repeated and continued failure to report them for the next 3 years is another matter. In the return for 1950 dividends of $1,200 were reported, but, also, a profit from the operation of the bar business of only $691.18 was reported. The explanation, that because the stocks were pledged to secure a loan the petitioner thought he did not have to report the dividends, is not convincing. However, the conclusions that fraudulent returns were filed for the years 1947 through 1949 do not rest solely upon the failure to report dividends in those years. Rather, they are made upon the whole record. The petitioner admits that the items of assets and liabilities in the net worth statement prepared by the respondent's agent are correct with the exception of the item of alleged *150 undeposited cash on hand and 4 other items, (1) the respondent's allowances in the reserve for depreciation of the building purchased in 1948, (2) the nondeductibility of the O.P.A. fine paid in 1947, (3) the respondent's omission of liabilities of $7,000 at the end of 1950 and 1951, and (4) the respondent's determination of the amount of petitioner's living expenses in each year. After the adjustments which have been made herein involving the 4 particular items, there remain substantial amounts of unreported income for the years 1947-1950, according to the revised and adjusted net worth analysis. The increases in net worth for the years 1947-1950 result primarily from the increases in assets about which there is not and never has been any dispute. It has been pointed out that the claim of petitioner that he had as much as $45,000 undeposited cash on hand at the beginning of the net worth period is not worthy of belief. We are not bound to accept testimony which patently appears to be "highly improbable or manifestly unreasonable." Carmack v. Commissioner, 183 F. 2d 1, certiorari denied 340 U.S. 875. After making a liberal allowance to the petitioner for undeposited *151 cash on hand at the end of 1945, there remain substantial increases in net worth, and large amounts of unreported income for 1947 through 1950 aggregating over $34,000, and the amount of unreported income for each year, shown by the adjusted net worth statement, exceeds the income which was reported by more than 100 percent. To establish fraud by direct proof of fraudulent intent is seldom possible, and whether it exists must be determined from all of the circumstances and the entire record. We are not limited to the respondent's affirmative evidence on the fraud issue. Lashells Estate v. Commissioner, 208 F. 2d 430; Rogers v. Commissioner, 111 F. 2d 987; Wallace H. Petit, 10 T.C. 1253; L. Schepp Co., 25 B.T.A. 419; Frank Imburgia, 22 T.C. 1002, 1014. The respondent's view is that the petitioner failed to report all of the income from his bar business in the years in question. In the absence of admissions on the part of the petitioner, the respondent must rely upon circumstantial evidence if he is to establish his contention. The circumstances here are the lack of accurate and complete accounting records, the substantial *152 increases in assets, the absence of competent proof of both a likely source of large cash accumulations prior to 1945 and 1946 and of the existence of such accumulations, the admitted amounts of gross receipts in each year, and the steadily declining amounts of reported profits. The respondent's proof is such that petitioner's claim to a large accumulation of cash is not credible. The rejection of a large part of petitioner's contention about cash on hand results in sustaining in a substantial amount respondent's determinations that petitioner realized income which he failed to report. There are many authorities which hold that the consistent understatement of large amounts of income over a number of years is evidence of fraudulent and willful intent to evade tax, standing alone, even though the usual indicia of fraud are absent. In Holland v. United States, 348 U.S. 121, the Supreme Court stated that "evidence of a consistent pattern of underreporting large amounts of income" will support "an inference of willfulness." See, also, Kashat v. Commissioner, 229 F. 2d 282; Rogers v. Commissioner, supra; Kurnick v. Commissioner, 232 F. 2d 678; *153 Epstein v. United States, 246 F. 2d 563; Schwarzkopf v. Commissioner, 246 F. 2d 731; Abraham Galant, 26 T.C. 354, 365; Bryan v. Commissioner, 209 F. 2d 822; Drieborg v. Commissioner, 225 F. 2d 216. On the entire record, we are convinced that the respondent has sustained his burden of proof on the fraud issue for the years 1947 through 1950. Despite his handicaps and deficiencies, the petitioner is an experienced businessman; he dealt almost entirely in cash; and whether or not he was adept at the formal aspects of bookkeeping, he certainly knew whether all of his income was being reported for tax. As we said in Abraham Galant, supra, p. 366, "These factors are by no means overcome by the evidence that [petitioners] maintained a receptacle where some amount of money for some period of time may well have been hidden." It is held that false and fraudulent returns were filed for 1947, 1948, 1949, and 1950; therefore, the statute of limitations is not a bar to the assessment and collection of the deficiencies determined for those years. It is held, also, that part of the deficiency for each year is due to *154 fraud with intent to evade tax and additions under section 293(b) are due, the amounts of which are to be recomputed. In view of our conclusion that a false and fraudulent return was filed for 1949, it is unnecessary to decide whether the respondent has met his burden of proving that the 5-year period of limitation under section 275(c) applies to 1949. Cf., H. A. Hurley, 22 T.C. 1256, affirmed on another point 233 F. 2d 177; and David Courtney, 28 T.C. 658, 668. Decision will be entered under Rule 50. Footnotes
1. On the basis of new evidence and the entire record now before the Court, findings are made of additional facts which supplement the original Findings of Fact. In addition, certain findings are made which change or modify some of the original findings, which changes are pointed out hereinafter.↩
2. The above finding that returns were filed timely for 1948 and 1951 is a revision of the findings originally made. See pp. 2, 15, 16, 20 of the original report.↩
3. This finding is related to the finding that an income tax return for 1948 was filed for petitioner; it revises the statements on pages 19 and 20 of the original report.↩
4. These findings change the corresponding findings on pages 11, 12, 13, 14, and 19 of the original report.↩
5. This concession requires a deletion of the amount, $1,532.90, from the schedule on page 15 and a corresponding revision on page 19 of the original report.↩
6. This finding revises the finding made on page 12 and the statement made on page 19 of the original report.↩
7. This finding requires increasing the figure of $5,206.47 to $12,500 for an item of cash on hand at the end of 1946 in the net worth statement on page 13 of the original report.↩
8. This finding modifies the finding on page 12 of the original Findings of Fact.↩
9. These figures represent in some instances revisions of figures in the schedule on page 15 of the original report.↩
10. Ordinarily, where a taxpayer has elected not to be represented by counsel in the first instance, his belated desire to be represented by counsel is not in itself a sufficient and adequate reason for the Court's granting further trial and reconsideration after the opinion has been served. In general, the Rules of the Court require that all motions must be timely. Also, "the employment of new counsel will never be regarded as good ground for a continuance uness it is timely." Rules 20(a) and 27(c)(2). Only under exceptional circumstances will the belated employment of counsel be considered as good ground for granting further trial and additional grounds ordinarily must be shown as justifying further trial and consideration. The granting of further trial in this case was necessary. However, it was an exception to the general rules of the Court and is not to be regarded either as ordinary procedure or as a precedent.↩
11. The statements appearing on pages 7, 8, 18, and 19 of the original report are accordingly modified.↩